In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1851 & 00-1932

WILLIAM A. BOWLES,

Plaintiff-Appellee, Cross-Appellant,

v.

QUANTUM CHEMICAL COMPANY,
a division of QUANTUM CHEMICAL
CORPORATION, a Hanson Company,

Defendant-Appellant, Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 2719--Rudy Lozano, Judge.

ARGUED FEBRUARY 27, 2001--DECIDED SEPTEMBER 11, 2001


  Before COFFEY, RIPPLE and EVANS, Circuit
Judges.

  RIPPLE, Circuit Judge.  William Bowles
left his management position at Quantum
Chemical Company ("Quantum") after
Quantum was acquired by Hanson PLC ("Han
son"). Dr. Bowles sued Quantum to recover
severance benefits allegedly due to him
under Quantum's severance protection plan
("the severance plan"). Following a bench
trial, the district court determined that
there was a diminution in Dr. Bowles'
authority, duties, responsibilities, and
status, which entitled Dr. Bowles to
benefits under the severance plan. The
court awarded Dr. Bowles $195,390, plus
attorneys' fees and prejudgment interest.
Quantum appeals that award. Dr. Bowles
cross-appeals on the grounds that (1) he
also is entitled to a supplemental bonus
that the district court did not award him
and (2) the court's award of attorneys'
fees was too low. For the reasons set
forth in the following opinion, we affirm
the district court's award of severance
benefits as well as its denial of the
supplemental bonus. We vacate and remand
the issue of attorneys' fees to the
district court for reconsideration.

I

BACKGROUND

A.  Facts

   Dr. Bowles, who holds a Ph.D. in Chemistry, was employed by Quantum or one of its predecessors from June 1976 until the time he left his position on September 30, 1994. At the time he terminated his employment, Dr. Bowles was serving as Quantum's director of polyolefins/1 research and technology acquisition, which was a senior-level management position.

   At trial, Dr. Bowles testified as to the nature of his job prior to September 30, 1993. According to Dr. Bowles, he was responsible for planning, organizing, and supervising the major polyolefins research projects at Quantum. Approximately 200 people reported to him, roughly half of whom were degreed professionals. Dr. Bowles reported directly to Dr. Michael Baldwin, the vice president of research and development, who in turn reported directly to Dr. Ronald Yocum, Quantum's president. The total corporate research budget was approximately $44 million, and approximately $29 million of that was allocated to Dr. Bowles' department. Dr. Bowles had a particular interest in the Q Technology project, the purpose of which was to find ways of making Quantum less dependent on its competitors' technology. He had spent anywhere between twenty and fifty percent of his time on that project since its inception in the early 1990s.

   As a senior-level manager, Dr. Bowles was eligible for certain bonuses and benefits. Pursuant to its senior manager performance plan ("the SMPP"), Quantum gave annual incentive bonuses/2 to certain employees if the company and the employee met or exceeded business goals. These bonuses were a certain percentage of the employee's base salary. Dr. Bowles was slated to receive target bonuses in 1993 and 1994, and, although the testimony on this point was conflicting, it appears that those bonuses should have been thirty percent of his base salary. Although Quantum did not pay out target bonuses in 1993, Dr. Bowles received a target bonus of $37,551.60 in 1994.

   Additionally, Dr. Bowles was eligible to participate in Quantum's incentive award deferral plan ("the deferral plan"). The

deferral plan allowed Dr. Bowles to invest all or part of the bonuses he received in the company's general fund. The money earned interest at a favorable rate, and Dr. Bowles did not have to pay taxes on it until the funds were paid out to him at a time he specified, presumably during his retirement when he would be in a lower tax bracket. The deferral plan contained a provision that required the company to pay out any and all funds in the plan thirty days after a change in control. This provision was designed to ensure that employees who had invested in the fund would not lose their money if the corporation became insolvent following a takeover. During the course of his employment at Quantum, Dr. Bowles invested approximately $191,000 in the deferral plan.

In the early 1990s, Quantum began experiencing serious financial difficulties. Quantum's senior management actively sought out another entity that could help Quantum get its financial affairs back on track. At the same time, the company revised its severance plan "to protect certain key managers from the effects of an actual or possible Change in Control." R.149, Pl.'s Ex.1 at 1. Under the revised severance plan, an employee who suffered a "loss of his or her employment within one year following a Change in Control" was entitled to receive severance benefits. Id. As is relevant here, there were two circumstances in which an employee could initiate the termination of his employment and still receive severance benefits for having suffered a loss of employment. First, an employee would receive benefits if he resigned following "a diminution of [his] authority, duties, responsibilities or status" ("the diminution trigger"). Id. at 3. Alternatively, the employee would receive severance benefits if he resigned following the acquiring company's

failure to provide [him] with the opportunity to participate, on terms no less favorable than those existing immediately prior to the Change in Control, in any incentive bonus, savings, pension or other employeebenefit plan of Quantum in effect immediately prior to the Change in Control (or plans and benefits which are, in the aggregate, no less favorable to [him] than those in

effect six months prior to the Change in Control) [("the loss-of-benefits trigger")].

Id. The occurrence of either trigger was sufficient for an employee to receive benefits under the severance plan.

An employee entitled to receive benefits under the severance plan also was entitled to receive an annual incentive bonus award. The drafter of the severance plan, C. William Carmean, testified by deposition that the purpose of this bonus provision was to ensure that an employee who had earned a bonus prior to a change in control still would be paid that bonus following the change in control. The rel evant provision of the severance plan provides:

Each eligible employee who becomes entitled to benefits under the Plan shall be paid an annual incentive bonus award, as described below, with respect to each year or portion thereof during the period beginning the first full year preceding a Change in Control and ending on the date such employee loses his or her employment. The annual incentive bonus award with respect to such year or portion thereof shall be the greater of (a) the amount of any such award actually granted to such employee with respect to such period, and (b) the amount of the award, if any, that would have been granted to such employee with respect to such period under the Senior Manager Performance Plan . . . as such plan was in effect with respect to bonuses granted for the full year preceding the Initial Year (the "Prior Year") and based upon such employee's target bonus for the Prior Year . . . .

Id. at 1-2. Lastly, the severance plan provided that "Quantum shall also pay all legal fees and expenses incurred by an eligible employee as a result of such employee's seeking to obtain or enforce any right or benefit" under the plan. Id. at 4.

On September 30, 1993, Quantum was acquired by Hanson. This acquisition constituted a change in control that triggered Quantum's obligation to pay severance benefits, provided that the employee also suffered a loss of employment within the meaning of the

severance plan. Dr. Bowles testified at trial that, in his opinion, Hanson's acquisition of Quantum significantly diminished his authority, duties, responsibilities, and status. Dr. Bowles believed that the most significant change in his job following the acquisition was the termination of the Q Technology project. According to Dr. Bowles, the company's decision to discontinue the Q Technology project "[b]asically gutted [his job]. It ripped the heart out of it." R.169-I at 38. Dr. Bowles perceived the termination of the project as an indication that the company no longer was going to pursue researching and developing its own technology. Not only did Dr. Bowles believe that this decision signified a decline in the importance of independent research to the company, he thought it was detrimental to the company's future.

Dr. Bowles also explained that, in his view, the restructuring inserted an extra layer of management between himself and the company president. Dr. Bowles' direct superior, Baldwin, who used to report directly to President Yocum, now reported to Gene Allspach, the vice president of manufacturing and technology. According to Dr. Bowles, this change in the hierarchy detrimentally affected his own position because Allspach, unlike Baldwin, did not have a research background. Consequently, Dr. Bowles had to spend a significant amount of time educating Allspach about research, whereas that process was unnecessary when Baldwin could go straight to Yocum on Dr. Bowles' behalf.

Dr. Bowles also described other deleterious changes to his job, such as a lower research budget, lower expenditure authorizations for him and his subordinates, and the loss of approximately twenty people in his department, five of whom were degreed professionals who performed important research functions within the department. Four additional employees who were responsible for process modeling were transferred out of the research and development department into the engineering department. According to Dr. Bowles, these four employees maintained the computers his department needed for data acquisition in addition to their process-modeling work. As a result of

their transfer, Dr. Bowles' department was left without anyone who could maintain its computers on an emergency basis, which hindered the advancement of the department's research and data acquisition.

In addition to these changes to his daily responsibilities, Dr. Bowles lost the opportunity to participate in the deferral plan, which he believed entitled him to severance benefits under the loss-of-benefits trigger. Pursuant to its terms, the deferral plan had paid out its funds, including those Dr. Bowles had invested, approximately thirty days after the change in control. Because the funds were distributed, Dr. Bowles had to pay taxes on them, and his tax liability was approximately $70,000. Prior to the time Dr. Bowles terminated his employment, Quantum did not implement a substitute program that allowed employees to shelter their bonuses the way the deferral plan had allowed them to do./3 Hanson did, however, introduce new employee benefits that previously were unavailable. For instance, it increased the company's 401(k) contributions, increased employees' travel and accident insurance, and added new employee discounts on a range of Hanson products.

An additional benefit Hanson implemented following the change in control was a supplemental bonus program that granted certain employees bonuses over and above the target bonuses they received under the SMPP. According to Myra Perkinson, Quantum's vice president of human resources and communications, Hanson added the supplemental bonus plan to "continue the momentum" of the company's success. R.169-II at 184. Dr. Bowles earned a $28,163.70 bonus for 1994 under this supplemental bonus plan;/4 however, Dr. Bowles never was paid this bonus.Perkinson explained that employees had to be employed by the company at the time of payout to receive the supplemental bonus, and employees who were eligible forseverance benefits could not receive a supplemental bonus. Nevertheless, Dr. Bowles believed that, because the annual incentive bonus provision of the severance plan was designed to protect any bonus an employee had earned, he was entitled to receive his supplemental bonus under the plan.

Dr. Bowles informed Quantum's management that he was terminating his employment and that he felt he was entitled to severance benefits. Perkinson, who was responsible for administering the severance plan and determining whether Dr. Bowles was entitled to severance benefits, consulted Baldwin about the scope of the changes to Dr. Bowles' job following the change in control. Perkinson and Baldwin's analysis of whether Dr. Bowles' job was diminished appears to have employed the Hay methodology, which Quantum used to evaluate the size of its employees' jobs. That methodology determined the size of a job by focusing on the "know how" required to do the job, the problem solving associated with the job, and the job's accountability. R.169-II at 158. According to the trial testimony, the most significant factor in rating research positions under the Hay methodology was the job's know how, and neither Perkinson nor Baldwin believed that this element of Dr. Bowles' job was affected by Hanson's acquisition of Quantum. Thus, Perkinson, together with Yocum and Quantum's senior counsel, concluded that Dr. Bowles' authority, duties, responsibilities, and status had not been diminished following the change in control.

In addition, Quantum did not believe that Dr. Bowles was denied the opportunity to participate in an employee benefit program under the loss-of-benefits trigger simply because the deferral plan had paid out its funds. Quantum viewed the payout as the fulfillment of the deferral plan rather than as its termination. Quantum also believed that, in the aggregate, the benefits available to Dr. Bowles had increased, which prevented the application of the loss-of-benefits trigger. For these reasons, Quantum determined that Dr. Bowles was not entitled to severance benefits. Dr. Bowles then sued to enforce the terms of the severance plan.

B.  Earlier Proceedings

After holding a bench trial, the district court entered findings of fact and conclusions of law. The court first concluded that the severance plan was an employee benefit plan covered by the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. sec. 1001 et seq., because it required "ongoing, case-by-case administration by persons exercising their judgment under standards not capable of mechanical application." R.129 at 5. Then, the court found specifically that Dr. Bowles' authority, duties, responsibilities, and status were diminished within the year following the change in control. The court referred to the following facts as support for its conclusion: (1) the budgets for the research department in general and for the polyolefins research group in particular were reduced by seven-figure amounts; (2) the Q Technology project, which took up at least twenty percent of Dr. Bowles' time, was terminated; (3) Dr. Bowles' authority to approve expenditures was reduced substantially, as was the authority of the persons reporting to him, which required Dr. Bowles to monitor more closely the expenditures of others; (4) an extra layer of management was added between Dr. Bowles and Quantum's president; (5) several people who worked for Dr. Bowles left the company and were not replaced; and (6) Dr. Bowles' supervisory position with respect to process modeling was eliminated.

The district court recognized that there was conflicting testimony regarding whether Dr. Bowles' authority, duties, responsibilities, and status were diminished; however, the court "found the testimony of [Dr.] Bowles to be credible because he knew the most about what happened to his job after the change in control and appeared candid." Id. at 3. The court explained further that its findings were based "on the totality of the evidence and the credibility of the witnesses." Id. Because the court determined that Dr. Bowles' authority, duties, responsibilities, and status had been diminished in the year following the change in control, it held that Dr. Bowles was entitled to severance benefits under the diminution trigger. It calculated the amount of the benefits owed to Dr. Bowles as $195,390./5

Although the court's finding that Dr. Bowles was entitled to benefits under the diminution trigger was sufficient to support its award of severance benefits to Dr. Bowles, the court went on to address whether Dr. Bowles also was

entitled to benefits under the loss-of-benefits trigger. In the district court's view, an employee was entitled to benefits under the loss-of-benefits trigger if he lost the opportunity to participate in a benefit plan, unless the benefits he retained were as favorable in the aggregate as the benefits that were available to him six months prior to the change in control. The district court did not believe that Dr. Bowles had demonstrated that the benefits he retained following the change in control were less favorable in the aggregate than those available to him six months prior to the change in control. Thus, the court held that Dr. Bowles was not entitled to severance benefits under the loss-of-benefits trigger.

The court then held that Dr. Bowles was not entitled to a supplemental bonus. The court found it persuasive that the only bonus mentioned in the severance plan was the annual incentive bonus award, which the court did not believe could be read to include the supplemental bonus. The court noted that, although Dr. Bowles had tried to show through extrinsic evidence that the supplemental bonus was part of the same program as the annual incentive bonus award explicitly mentioned in the severance plan, he had not met his burden of proof on this issue. Consequently, the court declined to award Dr. Bowles the $28,163.70 supplemental bonus he had earned in 1994.

Lastly, in accordance with the attorneys' fee provision in the severance plan, the court awarded Dr. Bowles his attorneys' fees. Dr. Bowles had signed a contingent fee agreement with his attorney, under which Dr. Bowles agreed to pay his attorney one-third of everything he was awarded. The district court awarded Dr. Bowles $64,478.70 inattorneys' fees, which is slightly less than one-third of the amount of the severance benefits it awarded him. The court also awarded Dr. Bowles prejudgment interest in the amount of $51,363.88.

II

DISCUSSION

Quantum appeals the district court's award of severance benefits, attorneys' fees, and prejudgment interest to Dr.

Bowles. Dr. Bowles cross-appeals the district court's determination that he was not entitled to a supplemental bonus; he also argues that he was entitled to receive one-third of the amount of the prejudgment interest award as additional attorneys' fees.

Following a bench trial, we review de novo a district court's conclusions of law. See NRC Corp. v. Amoco Oil Co., 205 F.3d 1007, 1011 (7th Cir. 2000). However, we afford great deference to the trial court's findings of fact, and we shall reverse only if those findings are clearly erroneous. See id. A finding is clearly erroneous when the reviewing court "'is left with a definite and firm conviction that a mistake has been committed.'" Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 910 (7th Cir. 2000) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)), cert. denied, 121 S. Ct. 1644 (2001). "If the district court's account of the facts is plausible in light of the record viewed in its entirety, we may not reverse that decision even if we may have decided the case differently." Id. "Furthermore, any reasonable doubts we may harbor should be resolved in favor of the district court's ruling 'in light of its greater immersion in the case.'" Id. (quoting Cook v. City of Chicago, 192 F.3d 693, 697 (7th Cir. 1999)). With these standards in mind, we turn to the merits of the parties' claims.

A. Applicability of ERISA

The parties dispute whether the severance plan is covered by ERISA. Quantum argues that ERISA applies because the terms of the severance plan require Quantum to maintain an ongoing administrative scheme. Dr. Bowles, on the other hand, argues that ERISA does not apply because the application of the severance plan does not require the exercise of discretion; instead, the severance plan provides for a one-time, lump sum payment upon the occurrence of a specified event./6 The district court accepted Quantum's argument and applied ERISA. We agree with the district court's conclusion.

ERISA will preempt a state law breach of contract claim if the claim requires the

court to interpret or to apply the terms of an employee benefit plan. See Collins v. Ralston Purina Co., 147 F.3d 592, 595 (7th Cir. 1998). An employee benefit plan can include severance payments. See 29 U.S.C. sec. 1002(1)(B); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 7 n.5 (1987). The decisive inquiry in determining whether a severance plan falls within ERISA's coverage is whether the plan requires an ongoing administrative program to meet the employer's obligation. See Fort Halifax, 482 U.S. at 11-12; Collins, 147 F.3d at 595-96. ERISA applies when a severance plan potentially places "periodic demands on [an employer's] assets that create a need for financial coordination and control." Fort Halifax, 482 U.S. at 12; see also Collins, 147 F.3d at 596. In contrast, "[t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation," and ERISA therefore does not apply. Fort Halifax, 482 U.S. at 12.

We previously considered a severance plan very similar to the plan involved in this case and concluded that ERISA ought to apply. See Collins, 147 F.3d at 595-97. In Collins, we found it persuasive that the employer "could not satisfy its obligation by cutting a single check and making a single set of payments to all of its managers [covered by the plan] at once." Id. at 595 (emphasis and internal quotation marks omitted). Instead, the employer was faced with a one-year period in which it had to budget for the prospect "of multiple payments to various managers, at different times and under different circumstances." Id. at 595-96 (emphasis omitted). Additionally, the plan required the employer to consider each manager's job responsibilities individually to determine whether those responsibilities had been reduced substantially. See id. at 596. We concluded that, because the plan required the employer to make "nonclerical judgment calls" on multiple occasions, an ongoing administrative scheme existed that brought the plan within ERISA's cov erage. Id. at 597 (internal quotation marks omitted).

We do not believe that Quantum's severance plan is materially different than the plan we considered in Collins.

Although the record does not reveal the exact number of Quantum employees covered by the severance plan, it is clear that others in addition to Dr. Bowles were covered. The covered employees had a one-year period in which they could make a demand for severance benefits, which required Quantum to budget for the possibility of making multiple payments throughout the course of that year. Perkinson also testified that, if Quantum believed that its obligation to pay severance benefits to a particular employee had been triggered within the year following the change in control, Quantum would notify that employee of his right to claim benefits. Thus, Quantum also had to develop a mechanism for monitoring the conditions of its employees' employment throughout the one-year eligibility period.

Additionally, Perkinson's testimony regarding the manner in which she administered the severance plan with respect to Dr. Bowles demonstrates that the severance plan was not capable of a mechanical application, but required the exercise of discretion. Once Dr. Bowles made his demand for severance pay, Perkinson did far more than simply calculate the amount of benefits to which Dr. Bowles was entitled and issue him a check. See Fort Halifax, 482 U.S. at 12 ("To do little more than write a check hardly constitutes the operation of a benefit plan."). Instead, she consulted with Baldwin regarding the changes in Dr. Bowles' employment following the change in control and made a "nonclerical judgment call" as to whether those changes diminished Dr. Bowles' authority, duties, responsibilities, or status. Collins, 147 F.3d at 597. Moreover, Perkinson would have had to undergo a similar process for each employee subject to the severance plan who demanded severance pay under the diminution trigger. This individualized investigation and assessment demonstrates that Quantum could not fulfill its obligations under the severance plan through a single, mechanical, nondiscretionary application of the plan's terms. See Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir. 1992) (holding that ERISA applied when the employer could not carry out its obligations under a severance benefit plan with an "unthinking, one-time, nondiscretionary application" of the

plan's terms).

We agree with the First Circuit that the sort of discretion that brings a severance plan within ERISA's coverage is a matter of degree, the assessment of which often requires the court to draw fine lines. See Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 854 (1st Cir. 1993). We believe our decision that Quantum's severance plan falls on the ERISA side of the line is supported not only by our own precedent, see Collins, 147 F.3d at 595-97, but by the precedent of other circuits that have considered similar plans./7 Moreover, we believe this case easily is distinguishable from those cases that have fallen on the non-ERISA side of the line. This case is not one in which the administrator was required simply to make an arithmetical computation. See, e.g., Young v. Wash. Gas Light Co., 206 F.3d 1200, 1203-04 (D.C. Cir. 2000) (holding that ERISA did not apply to a severance plan when "the determinations of eligibility and the amount of the benefits to be paid were purely mechanical" and were triggered solely by the employee's decision to retire pursuant to the terms of the plan, which left the employer with nothing to do but "calculate the amount of the separation payment" pursuant to a set formula); Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 258 (8th Cir. 1994) (holding that ERISA did not apply to a severance plan because "once a hostile takeover occurred and [the employee] resigned his employment for what he regarded as a good reason, there was nothing for the company to decide, no discretion for it to exercise, and nothing for it to do but write a check"). Nor is this a case in which the amount of discretion exercised is insignificant. See Velarde v. Pace Membership Warehouse, Inc., 105 F.3d 1313, 1317 (9th Cir. 1997) (holding that the "minimal quantum of discretion" needed to determine whether an employee had been terminated for cause was insufficient to implicate ERISA);/8 see also Young, 206 F.3d at 1204 (holding that the one discretionary act of selecting an employee's separation date was insufficient to implicate ERISA). In light of these considerations, it seems clear to us that the severance plan at issue here falls within ERISA's coverage.

Because we have determined that

Quantum's severance plan is governed by ERISA, we shall construe the plan in accordance with the federal common law under ERISA and shall apply general rules of contract interpretation. See Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir. 1998), cert. denied, 526 U.S. 1087 (1999). We note that federal courts "must interpret the express terms of a plan 'in an ordinary and popular sense as would a person of average intelligence and experience. . . .'" Id. (quoting Pitcher v. Principal Mut. Life Ins. Co., 93 F.3d 407, 411 (7th Cir. 1996)).

B.  The Diminution Trigger

We must first consider whether the district court erred in awarding Dr. Bowles severance benefits under the diminution trigger. Quantum argues that, as a matter of law, it is inherent in the diminution trigger that trivial changes in an employee's job do not obligate Quantum to pay severance benefits. Quantum believes that the severance plan makes little practical sense without such a qualification. Dr. Bowles, on the other hand, argues that the severance plan itself does not quantify or qualify the degree of diminution necessary to trigger an award of benefits. Alternatively, Dr. Bowles argues that the district court found that the changes in his job were significant.

Even if we accept Quantum's suggestion that trivial changes in an employee's job are insufficient to trigger an award of benefits, we agree with Dr. Bowles that the district court considered the diminution in his authority, duties, responsibilities, and status to be significant. Although the district court stated in its opinion that "the severance plan does not contain any express language to qualify or quantify the degree of diminution required to establish the trigger," R.129 at 6, the language the court used in discussing the changes in Dr. Bowles' job belies Quantum's assertion that the court thought these changes were trivial. In particular, the court found that (1) Dr. Bowles' budget was reduced by "seven-figure amounts;" (2) the Q Technology project, "a major research initiative that [Dr.] Bowles was instrumental in," was terminated; (3) Dr. Bowles' authority to approve expenditures "was reduced

substantially;" and (4) Dr. Bowles' "supervisory position with respect to process modeling was eliminated." Id. at 2-3 (emphasis added). These emphasized words indicate to us that the district court considered the degree to which the changes affected Dr. Bowles' position and believed that those changes had a meaningful impact. Moreover, the court also found that (1) the expenditure authority of employees below Dr. Bowles was reduced, which required Dr. Bowles to monitor their spending more closely; (2) an extra layer of management was added between Dr. Bowles and President Yocum; and (3) employees who worked for Dr. Bowles left and were not replaced. Our review of the record and the trial testimony reveals that there is evidentiary support for each of the court's factual findings. Thus, we are unable to conclude that any of these determinations are clearly erroneous.

Quantum offers numerous reasons why the changes we have just detailed were not true diminutions in Dr. Bowles' job. We are unpersuaded by these explanations. The district court specifically found that the changes were diminutions. It has been clear throughout this litigation that Quantum, and those of its employees responsible for administering the severance plan, disagreed with Dr. Bowles' perception of the impact these changes had on his job. However, the district court stated explicitly that it found Dr. Bowles' testimony credible-- more credible than that of the severance plan's administrators--and we are not in a position to ignore or second-guess that finding. See United States v. Childs, 256 F.3d 559, 562 (7th Cir. 2001) ("If, in making factual determinations, the district court deems the testimony of one witness more credible than that of another witness and that testimony is supported by the record, there can be no clear error."). As a result, Quantum's attempt to explain away the district court's findings cannot succeed.

It is clear to us that the district court believed that the changes in Dr. Bowles' authority, duties, responsibilities, and status were meaningful diminutions. Because we find no clear error in the district court's findings, we uphold its award of severance benefits to Dr. Bowles under

the diminution trigger./9

C.  The Supplemental Bonus

   Dr. Bowles argues that his damages award should have included an additional $28,163.70 that he earned under Hanson's supplemental bonus program. An employee eligible for benefits under Quantum's severance plan also would receive an annual incentive bonus award, the amount of which was determined by the amount of the target bonus that the employee received under the SMPP. Dr. Bowles admits that he received his target bonus under the SMPP for 1994. However, he believes that he also was entitled to receive the supplemental bonus he earned in 1994 because his ability to earn that bonus was dependent upon his participation in the SMPP. Dr. Bowles also relies on the deposition testimony of Carmean, the severance plan's drafter, to support his argument. Specifically, Dr. Bowles contends that Carmean testified that the provision of the severance plan at issue here was designed to protect any bonus the employee earned prior to the change in control. Quantum responds to Dr. Bowles' argument by pointing out that the severance plan only mentions the annual incentive bonus award, not the supplemental bonus.

   "[A]s a general rule, an unambiguous contract should be construed without reference to extrinsic evidence . . . ." Grun, 163 F.3d at 420. "[I]f the language of the contract provides an answer, then the inquiry is over; parol evidence is neither necessary nor admissible." Id. The district court concluded that, as a matter of law, "the proper interpretation of the severance plan is that it does not provide for payment of a supplemental bonus." R.129 at 2-3. We agree with the district court's conclusion. The operative documents do not suggest a connection between the supplemental bonus and the annual incentive bonus award provided in the severance plan. The bonus available under the severance plan is defined in terms of the target bonus available under the SMPP; the severance plan makes no mention of the supplemental bonus. Dr. Bowles correctly asserts that he was only eligible for the supplemental bonus because he was a participant in the SMPP; however, the fact that eligibility for both the target bonus and the supple

mental bonus was defined by reference to the SMPP does not, in itself, establish that the two bonuses were part of the same overall bonus program. Without such a connection between the two bonuses, we are unable to conclude as a matter of law that Dr. Bowles is entitled to the supplemental bonus under the severance plan.

Even if we were to find ambiguity in this provision of the severance plan and therefore looked to extrinsic evidence to determine its meaning, we would have to conclude that Dr. Bowles did not meet his burden of proving that the supplemental bonus was part of the annual incentive bonus award. Every indication in the record is that the two programs were entirely separate. The supplemental bonus program did not exist at the time the severance plan was drafted. Instead, Hanson implemented the supplemental bonuses after it had acquired Quantum. The literature describing the target bonuses available under the SMPP does not mention supplemental bonuses. Moreover, it appears that employees only could receive a supplemental bonus after they had earned all of the bonus money that was available under the SMPP. In addition, the target and supplemental bonuses are itemized and labeled separately on Dr. Bowles' bonus summary for 1994. Indeed, the only evidence Dr. Bowles can offer to connect the two bonus programs is Carmean's testimony that the severance plan was designed to protect a bonus that the employee earned prior to the change in control. However, that testimony is not directly supportive of Dr. Bowles' argument because, when Carmean made the statement, he was referring specifically to the target bonus program as discussed in the provision of the severance plan concerning the annual incentive bonus award. As we already have indicated, that provision of the severance plan makes no mention of the supplemental bonus.

In sum, we do not believe that Dr. Bowles has demonstrated that the provision of the severance plan that grants eligible employees an annual incentive bonus award encompasses the supplemental bonus. Therefore, the district court did not err in refusing to include the supplemental bonus in its calculation of Dr. Bowles' damages.

D. Attorneys' Fees

Dr. Bowles signed a contingent fee agreement with his attorney that granted his attorney one-third of the total amount Dr. Bowles recovered, including the prejudgment interest. In light of this agreement, Dr. Bowles argues that the district court's award of attorneys' fees should be increased by one-third the amount of the prejudgment interest award. Quantum responds that an award of attorneys' fees is within the discretion of the district court, and the district court did not abuse its discretion here.

When an ERISA plaintiff seeks an award of attorneys' fees pursuant to ERISA's fee shifting provision, 29 U.S.C. sec. 1132(g)(1), we review the district court's award for an abuse of discretion. See Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 592 (7th Cir. 2000). However, it appears that Dr. Bowles' request for attorneys' fees is contractual, not statutory. The severance plan specifically provides that

Quantum shall also pay all legal fees and expenses incurred by an eligible employee as a result of such employee's seeking to obtain or enforce any right or benefit under [the] Plan, unless a court or arbitrator finds such employee's challenge was without merit . . . .

R.149, Pl.'s Ex.1 at 4 (emphasis added). Given that we have determined that Dr. Bowles is entitled to severance benefits, we cannot say that his claim was without merit. Thus, the plain language of the severance plan entitles him to his attorneys' fees, and the amount of those fees is a matter of contract interpretation, not a matter of discretion. See Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 814 & 818 (7th Cir. 1997) (evaluating whether the plaintiff was entitled to attorneys' fees under the provision of his severance agreement that granted him "all reasonable legal fees and expenses actually incurred," without considering the requirements for an award of statutory fees under ERISA).

That interpretation appears to us to be straightforward. The severance plan

grants Dr. Bowles all his fees and expenses. Here, Dr. Bowles' attorneys' fees will include one-third of the amount of the prejudgment interest award; therefore, Quantum is contractually obligated to pay him that amount as part of his attorneys' fees. Because the district court did not include this additional amount as part of Dr. Bowles' fee award, we vacate the attorneys' fee award and remand this issue to the district court to allow it to modify its judgment.

Conclusion

Dr. Bowles is entitled to recover severance benefits because he suffered a diminution of his authority, duties, responsibility, and status within the meaning of Quantum's severance plan. He is not entitled to recover a supplemental bonus. Additionally, the district court's award of attorneys' fees should have included one-third of the amount of prejudgment interest awarded to Dr. Bowles. This case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED

FOOTNOTES

/1 Polyolefins are low-cost plastics that are used primarily in disposable items, such as garbage bags.

/2 From our review of the record, it appears that the parties also have referred to these bonuses as "target bonuses." As we shall discuss later, the severance plan gives employees eligible for severance benefits an annual incentive bonus award. Although we believe that the annual incentive bonus award available under the severance plan is related to the annual incentive bonus award available under the SMPP, for the purpose of clarity we shall refer to the bonuses under the severance plan as annual incentive bonus awards and, as the parties have done, we shall refer to the bonuses under the SMPP as target bonuses.

/3 The trial testimony indicated that Hanson may have implemented a deferral plan that was more favorable than the original after Dr. Bowles had terminated his employment.

/4 This bonus appears to have covered the fiscal

year that ran from October 1, 1993, to September 30, 1994.

/5 The severance plan provided the following formula for computing an employee's severance benefits: The amount of the employee's 1993 salary plus his 1993 target bonus, divided by 52, and multiplied by 65.

/6 Dr. Bowles has given us no indication of what law he thinks ought to apply instead of ERISA. However, it does not appear that the application of state law principles would alter the result reached in this case.

/7 See, e.g., Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 935 (8th Cir. 1999) (holding that a severance benefits plan was governed by ERISA when eligible employees might be terminated singly or in groups of indeterminate size, terminations could take place at any time, and benefits were to be paid only to those employees who were not terminated for disciplinary reasons and who gave excellent service to the company); Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 76 (2d Cir. 1996) (holding that a severance benefits plan was subject to ERISA when it required the employer to determine whether the employee (1) had been terminated involuntarily, (2) had been terminated for either illegal conduct or substantially deficient performance, (3) was making a reasonable effort to obtain other employment, and (4) had obtained new employment that was commensurate with his former position); Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir. 1992) (holding that, even though the employer's obligation to pay severance benefits was triggered by the one-time event of a change in control, the severance plan was covered by ERISA because it required the employer to assess each employee's eligibility individually and at different times to determine whether the employee had been offered a "substantially equivalent" job).

/8 But see Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 567 (2d Cir. 1998) (holding that a severance plan's requirement that the employer determine whether the employee had been terminated for cause was a factor that suggested that ERISA ought to apply); Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849, 853 (1st Cir. 1993) ("The 'for cause' determination, in particular, is likely to provoke controversy and call for judgments on information well beyond the employee's date of hiring and termination," which could implicate ERISA).

/9 Because we have determined that Dr. Bowles is entitled to severance benefits under the diminu-

tion trigger, it is unnecessary for us also to consider whether he is entitled to benefits under the loss-of-benefits trigger.