# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-1918, 03-2034, 03-2461

JUDY DABERTIN,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

HCR MANOR CARE, INC., MANOR CARE, INC.
SEVERANCE PLAN FOR SELECTED EMPLOYEES,
MANOR CARE INC. SEVERANCE PLAN FOR
SELECTED EMPLOYEES COMMITTEE, MANOR
CARE INC. SEVERANCE PLAN FOR SELECTED
EMPLOYEES PLAN ADMINISTRATOR,

*Defendants-Appellants, Cross-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CV 1702—**Ian H. Levin**, *Magistrate Judge.*

———————

ARGUED DECEMBER 1, 2003—DECIDED JUNE 24, 2004

———————

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* After being denied benefits under her employer's Severance Plan for Selected Employees ("Plan"), Judy Dabertin brought an action under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. §§ 1001 *et seq.* against her employer HCR Manor
Care ("HCR"), the Plan, and the Plan's administrator and
the committee appointed by HCR's Board of Directors to
administer the Plan ("Committee") seeking district court
review of the Committee's determination. The district court
held that the Committee was arbitrary and capricious in
denying Dabertin's claim for severance benefits. We affirm
in all aspects save for one minor housekeeping matter
which we remand for further consideration.

## I.

For over seventeen years, Judy Dabertin worked for
Manor Care Inc. ("Manor Care"), a company that owns and
operates skilled nursing facilities across the country. For at
least some portion of those years, Dabertin worked as one
of several vice presidents of operations. Over the course of
that time she became accustomed to her duties as vice
president. Those duties changed, however, when, in Sep-
tember 1998, Manor Care merged into a subsidiary of
Health Care and Retirement Corporation. Paul Ormond,
the designated President and Chief Executive Officer of the
new organization, HCR, embarked on a plan to radically
alter operations in the merged entity. As part of his plan, he
required all vice presidents of operations, including
Dabertin, to take on the additional role and title of general
managers. As general managers, Ormond expected the
executives to spend significantly more time in the facilities
assigned to them and participate more directly in their day-
to-day management. All of the vice presidents, including
Dabertin, were required to perform all of the same func-
tions they performed when they were solely vice presidents,
but to those duties Ormond added new ones— those of a
general manager. To accommodate the time-consuming
nature of these increased hands-on duties, Ormond opted to
reduce the number of facilities to which some vice presi-

dents were assigned. Dabertin, for example, had formerly directed operations of all of the facilities in the Central and Western Divisions of the company. The facilities in the Western Division, however, were geographically dispersed throughout California, Washington, Utah, Nevada and Arizona. According to HCR, the wide geographic dispersion of the facilities would make managing the Western Division under the new hands-on approach significantly more difficult than before. Consequently, Manor Care determined that in order to enable Dabertin to perform her new managerial duties properly, she could no longer oversee operations at both divisions. Ormond, therefore, assigned her to the Western Division alone. According to the defendants, Dabertin maintained the same authority, functions, duties, and responsibilities in the Western Division as she had previously for both the Central and Western Divisions. As a practical matter, however, this meant that she went from having authority for and oversight over forty-eight facilities to twenty-seven, from thirty-four skilled nursing units to seventeen, and from 4,639 beds to 2,309. According to Dabertin, she lost all of her authority, functions, duties and responsibilities for the Central Region operations, one of the largest and most complex markets. Her budgeted revenue decreased from $232 million to $114 million and her operating profits decreased from $61 million to $27 million. Her independent capital spending authority went from $6 million to zero, and she lost her independent authority to manage her total budget. She no longer had any responsibility and authority for development and implementation of advertising, public relations, consulting, business meetings, seminars, and conventions. HCR eliminated her construction project authority for twenty Western Division sites and eliminated her role in identifying, reviewing, overseeing, and coordinating construction projects. When HCR closed the Pleasant Hill, California and Lombard, Illinois facilities, Dabertin lost her management function and hiring and firing authority for seventy-three staff members.

Dismayed by what she saw as her waning authority, on October 21, 1998, Dabertin gave notice to her supervisor, Keith Weikel, that she was leaving HCR. She made a claim for severance benefits under the Plan which had been adopted in preparation for the merger. That Plan designated thirty-nine officers, including Dabertin, as Plan participants. Under the terms of the Plan, employees were entitled to severance benefits in the following two circumstances:

> A Participant shall be entitled to severance benefits under this Plan if and only if his employment with the Company . . . terminates under either of the following circumstances:
>
> (A) a termination by the Company . . . other than for Cause, or
>
> (B) a termination by the Participant for Good Reason.

(Sep. App. at 163).

The Plan defines "Good Reason" as "a significant reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities." (Sep. App. at 161). Dabertin submitted to HCR that she had "good reason" to terminate her employment with HCR because, among other things, the number of facilities, beds, direct reports, and construction projects assigned to her had decreased.

HCR claims, however, that prior to the merger, Ormond (the incoming president and CEO of the merged entity) discussed the purpose and goal of the Plan with Stuart Bainum, Jr., the CEO of the former Manor Care. According to HCR, Ormond stated that Dabertin and the other executives were critical to the success of the merged entity and he did not want the Plan to give them an incentive to resign and receive severance benefits under the Plan. Ormond and Bainum agreed that a switch to a more hands-

on operating procedure would not trigger any entitlement to severance benefits. Dabertin, of course, was not privy to these conversations. Nor were Ormond's intentions recorded in the text of the Plan.

Weikel denied Dabertin's claim for benefits and she appealed that denial to the Committee. On January 14, 1999, the Committee—comprised of Ormond and three others—met to consider Dabertin's claim for benefits. During the hour-long consideration of Dabertin's claim, Ormond relayed his pre-merger conversation with Bainum to the Committee, reiterating that it was his intention that the switch to the new hands-on approach would not constitute a reduction in the scope of a vice president's authority, position, title, functions, duties or responsibilities, and therefore would not trigger entitlement to benefits. The Committee interpreted the Plan consistently with Ormond's stated intention and denied Dabertin benefits, determining that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the *scope* of the Participant's authority, duties, functions and responsibilities would not be affected." (Sep. App. at 231) (emphasis in original). It determined that in Dabertin's case, her duties, responsibilities, authority, title, position and functions had actually "significantly increased" since, she, as well as the other vice presidents, "were expected to spend significantly more time in the facilities in their divisions, they were required to conduct operations reviews with the Regional Directors of Operations on every month on every center and they were required to be more involved in the day-to-day oversight of the centers in the areas of quality of care, staffing levels, accounts receivables, workers compensation and agency utilization." (Sep. App. at 233). Finally, the Committee reasoned that Dabertin's title and position were the same under the new operating scheme as the old: she

was a vice president before the merger and remained a vice president after, and the additional title of general manager did not reduce her position within the company. To the contrary, the Committee found that Dabertin's position with Manor Care was enhanced by the fact that the company was approximately twice as large as it had been before the merger. In short, the Committee concluded that if Dabertin had lost any duties, responsibility, authority, etc., she had gained far more and was not entitled, therefore, to severance benefits under the plan.

Dabertin filed suit in the district court on March 15, 1999, claiming that HCR, the Plan, Manor Care, the Committee, and the Plan Administrator ("defendants") violated ERISA by refusing to pay her severance benefits, withholding certain documents related to the Plan, and breaching their fiduciary duties to Plan participants. In the alternative, she asserted claims for breach of contract and violation of the Illinois Wage Payment and Collection Act. Holding that ERISA preempted the state law claims, the district court entered summary judgment for the defendants on those claims as well as the ERISA claim that the defendants had wrongfully withheld Plan documents. *Dabertin v. HCR Manor Care, Inc.*, 177 F. Supp. 2d 829, 840-42 (N.D. Ill. 2001) ("*Dabertin I*"). The district court also held that the Committee was not arbitrary and capricious in deciding that any changes in Manor Care's bonus system did not adversely affect Dabertin and that Manor Care had not significantly reduced Dabertin's employee benefits. *Id.* at 853-54. A genuine issue of material fact, however, prevented the district court from determining whether the Committee acted arbitrarily and capriciously when it concluded that HCR had not reduced that scope of Dabertin's duties, responsibilities, authority, title, position and functions. *Id.* at 852. Consequently, the district court held a bench trial to determine the content of the record before the Committee and subsequently—on December 19,

2002—determined that the Committee's decision was indeed arbitrary and capricious. *Dabertin v. HCR Manor Care, Inc.*, 235 F. Supp. 2d 853, 867-68 (N.D. Ill. 2002) (*Dabertin II*). In a separate order entered on March 27, 2003, the court awarded $245,775 in prejudgment interest, and $270,617.08 in attorneys' fees and costs.

After the liability decision, the parties stipulated to the benefits calculation except for the calculation regarding the bonus that Dabertin argued she should receive. On March 25, 2003, the district court calculated Dabertin's bonus benefit amount and then on March 27, 2003, entered an order awarding Dabertin $785,150 in total benefits and $245,775 in prejudgment interest (R. at 113). On May 19, 2003 the court entered an order awarding Dabertin $270,671.08 in attorneys' fees and costs. (Sep. App. at 272).

The defendants timely appealed the district court's decision that the Committee was arbitrary and capricious (the December 19, 2002 order) as well as the order awarding fees and costs (the May 19, 2003 order). Dabertin cross-appealed, contesting the district court's calculation of the benefit amount (the March 27, 2003 order) and the court's earlier grant of summary judgment (the December 20, 2001 order) in *Dabertin I*.[1]

---

[1] Dabertin states that "[i]f, as we submit, the District Court correctly decided the Article 1.8(i) Good Reason claim after a bench trial, this Court need not address the summary judgment issues regarding Dabertin's Article 1.8(iv) and (v) and fiduciary breach claims or the *de novo* review and heightened scrutiny issues." (Appellee's Brief at 30). Thus Dabertin's cross-appeal of the December 20, 2001 district court order (*Dabertin I*) is conditioned on our ruling in favor of the defendant on the defendant's appeal of the December 19, 2002 order. For the reasons supplied *infra*, we need not address Dabertin's cross-appeal of the fiduciary breach claims or the *de novo* review and heightened scrutiny issues.

## II.

Before addressing the merits, we must resolve the parties' dispute over the appropriate standard of review. Where an ERISA plan gives the plan administrator discretion to interpret the plan terms or determine benefits eligibility, a reviewing court employs the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Militello v. Cent. States, Southeast and Southwest Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir. 2004). The district court determined, and neither party disputes on appeal, that the plan at issue here gives such discretion. *See Dabertin I*, 177 F. Supp. 2d at 843-44. Consequently, we, like the district court, look only to see whether the Committee acted arbitrarily and capriciously in denying Dabertin benefits.[2] *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003)*, Johnson v. Allsteel, Inc.*, 259 F.3d 885, 889-90 (7th Cir. 2001), *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 980 (7th Cir. 1999). This standard gives great deference to the decision of a committee which cannot be overturned unless the committee's decision was a downright unreasonable one. *Carr v. The Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999). It is not the function of the district court to decide

---

[2] The discrepancy in the parties' positions regarding the standard of review may have resulted, in part, from the fact that in this case the district court conducted a brief bench trial to resolve factual issues related to Dabertin's loss of position and title, her loss of independent capital spending authority, loss of hiring and firing authority, loss of cluster market functions, and the defendants' freezing of construction projects. *Dabertin I*, 177 F. Supp. 2d at 852. The trial, however, was limited to determining what the record was before the Committee—a factual determination that we would review for clear error. *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002). This does not affect the level of deference that we owe to the Plan Committee's determinations.

whether it would have reached the same conclusion as the committee (*Id.)* or to substitute its judgment for the judgment of the committee. *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936 (7th Cir. 1989). But even review under this most deferential standard does not amount to a rubber stamp. *Hackett*, 315 F.3d at 774-75. The committee must articulate a rational connection between the facts found, the issue to be decided, and the choice made. *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109 (7th Cir. 1998). Where the committee's interpretation of the plan defies all common sense, the district court must overturn that decision. *See Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) ("In some cases, . . . simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious.")

The facts regarding the changes to Dabertin's job are largely undisputed.[3] They include: (1) reduction of her independent capital spending authority from $6 million to zero; (2) elimination of her overhead budget development and implementation responsibilities and authority for advertising, public relations, consulting, business meetings, seminars and conventions; (3) elimination of her management functions including hiring and firing authority for seventy-three staff members; (4) elimination of independent authority to manage her total budget; (5) elimination of management functions and responsibilities in three areas; (6) discontinuation of construction project authority, functions and responsibilities in twenty sites in the Western

---

[3] There appears to be a minor dispute as to whether Dabertin lost responsibility for cluster markets or MedBridge accounts in the Western Division. *See* Combined Reply/Responsive Brief of Defendants-Appellants/Cross-Appellees at 11. The defendants do not, of course, dispute that Dabertin lost all of her functions and responsibilities in the Central Division. Nor do they dispute that she lost some functions in the Western Division. *Id.* at 12.

Division; (7) elimination of a host of decision-making authority and other responsibilities for building projects and new markets; (8) elimination of operational, administrative and strategic authority, position, title, functions, duties or responsibilities for the Central Division; (9) reduction of her overall budget authority, her budgeted revenue, and her budgeted operating profit; (10) reduction by half of the number of skilled nursing units and the number of beds under her authority; and (11) a halving of the number of direct reports. *Dabertin II*, 235 F. Supp. 2d at 859-61. It is also undisputed that HCR added new tasks to Dabertin's plate with the addition of her new duties as a general manager.[4] *Id.* at 860.

The question we face is whether these job alterations amounted to a "reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities" so as to trigger payment of benefits under the Plan. The Committee determined that the scope of Dabertin's employment had not changed as she had the same list of duties before and after the merger; she just had fewer facilities in which to perform them. (Sep. App. at 363). It also concluded that the additional tasks of "general manager" added to the scope of her duties. *Id.* Under the Committee's interpretation of the term "scope", if Dabertin had certain duties, responsibilities, and functions for 100 facilities before the merger, and had the same duties, responsibilities and functions for fifty facilities after the merger, she would not suffer a significant reduction in the scope of her duties,

---

[4] Dabertin argues that there was no record evidence before the Committee regarding the addition of these duties and that the defendants cannot, in their appeal, use the Committee's own decision as a substitute for record evidence. The district court deemed it unnecessary to reach Dabertin's argument on this matter, (*Id.* at 868, n. 17) and we agree.

responsibilities or functions. The district court reasonably concluded that this definition of "scope" defied common sense and was not in accord with the ordinary and popular meaning of the term, and therefore was arbitrary and capricious. *Id.* at 865-66. In some cases, "simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess*, 274 F.3d at 461. This is just such a case.

The Committee's interpretation of a decrease in the scope of duties defies common sense. If HCR had added to each vice president's duties a new set of duties—emptying bedpans, delivering meals, and mopping floors—under HCR's interpretation of the Plan, these new duties would not have decreased the "scope" of the vice president's role at all. In fact, the scope of the vice president's duties would have increased. After all, they have not lost their title (they are still vice presidents, they have just added to that title the additional title of "janitor"). Likewise, they have not lost any of their prior duties; they simply have added a few new tasks. Common sense dictates otherwise. When the defendants took the Central Division away from Dabertin, they eliminated her authority for the Central Division, and the additional general manager tasks in no way compensated Dabertin for the loss of authority. Although the tasks assigned to a general manager are not as low in the corporate pecking order as those of a janitor, they are lower nevertheless. It is not Dabertin's loss of prestige alone, however, that bolsters our conclusion that HCR significantly reduced Dabertin's job. There is plenty of other evidence that she suffered a significant reduction in her authority, functions, duties and responsibilities. So much evidence, in fact, that any decision by the Committee otherwise would be arbitrary and capricious.

The defendants, of course, must concede that by eliminating her responsibilities for the Central Division, Dabertin

lost responsibility for beds, staff, facilities, and projects. They also concede that Dabertin did lose some duties, responsibilities, authority, position and functions in the Western Division as well. Combined Reply/ Responsive Brief of Defendants-Appellants/Cross-Appellees at 12. They dismisses these as insignificant based on the fact that Dabertin did not mention the loss in her initial application for benefits, but raised it for the first time on appeal to the Committee, and then "buried" the claim on the last pages of her twenty-three page position paper submitted to the Committee. We think it unfair to impose a judgment regarding the significance of a loss based on the page number on which the claim appears. Likewise, the defendants put too fine a point on the fact that Dabertin did not mention a particular loss in her initial application for severance benefits. She had no reason to know that her application for benefits would be so hotly contested and that she might need to load it with every piece of available evidence of job diminution from the get-go. In any case, her twenty-three page position paper submitted to the Committee and her brief before the district court set forth in great detail all of the many ways in which she believed HCR had significantly reduced the scope of her authority, position, title, functions, duties or responsibilities, including the loss of beds, staff, budget dollars, and construction oversight, to name a few. As the district court concluded:

> a lay person could reasonably conclude that the phrase "scope of a Participant's authority, position, title, functions, duties or responsibilities" when applied to a Vice-President of Operations for the Central/Western Division would mean the common measures of that Vice-President's authority, functions, duties and responsibilities over and involving beds, facilities, employees, budgets, and projects managed or supervised. In the ordinary and popular sense then the number of beds, facilities, projects and direct reports would define

the scope or extent of such an employee's authority, position, functions, duties or responsibilities. HCR Manor Care, however, adopted a definition of the term "scope" that was beyond the ken of "a person of average intelligence and experience."

*Dabertin II*, 235 F. Supp. 2d at 865 (internal citations omitted).

The defendants refer us to *Collins v. Ralston Purina Co.*, 147 F.3d 592, 596 (7th Cir. 1998) as evidence of this court's recognition of the possibility that an employee whose territory is reduced but who gains additional tasks does not necessarily suffer a substantial reduction in duties or authorities. In the first instance, the defendants contort the language and reasoning of *Collins*. The majority in *Collins* did not conclude that Collins' responsibilities and duties were not significantly reduced, but rather the opinion concluded that Collins' employer never actually re-assigned Collins' duties, nor did it even make an offer to do so. *Id.* at 600. Collins thought he saw the writing on the wall and quit before he could be re-assigned. In fact, the majority stated, "[w]ithout more we will assume the . . position offered to Collins would have meant a lesser job and fewer responsibilities." *Id.* In any case, the determination of what constitutes a substantial reduction in duties and responsibilities obviously varies greatly based on the specific facts of the particular case and the tasks allotted before and after a job re-assignment. After considering all of the evidence that the Committee had before it, including the functions, duties, and responsibilities Dabertin lost, as well as those she gained, we conclude, that under a common sense view of the changes in Dabertin's job assignments, the Committee arbitrarily and capriciously denied her benefits. There simply is no rational connection between the facts (the amount of authority, beds, budget, etc. that Dabertin lost) and the Committee's conclusion that HCR did not reduce the scope of her job. *See Cozzie*, 140 F.3d at 1109 ("The

committee must articulate a rational connection between the facts found, the issue to be decided, and the choice made.")

This lack of rational connection is certainly enough to allow us to conclude that the Committee's decision was arbitrary and capricious. In addition, we agree with the district court that the Committee imposed new requirements on Plan participants that were not part of the plain language of the Plan. *Dabertin II*, 235 F. Supp. 2d at 866. An ERISA benefit cannot be a moving target where the plan administrator continues to add conditions precedent to the award of benefits. *See Swaback v. Am. Info. Tech. Corp.*, 103 F.3d 535, 542 (7th Cir. 1996) (it is arbitrary and capricious to impose requirements that are not part of the plain language of the benefit plan); *Cozzie*, 140 F.3d at 1108 (an insurance company is bound by the terms of the benefit and although it may interpret the language of the plan, it may not modify it). The district court noted three additional qualifications that the Committee added that did not exist in the plain language of the Plan:

> (1) that "if a Participant continues to have a full range of operational, financial, administrative and other authority, functions, duties and responsibilities with respect to the business unit the Participant manages, the *scope* of the Participant's authority, functions and responsibilities would not be affected;"

> (2) "that absent a significant adverse effect on the Participant's status in the organization (e.g., reporting relationships, participation in major decisions, etc.) or a significant reduction in the scope of the Participant's authority, duties, functions or responsibilities with respect to the business unit for which the Participant has responsibility, a significant reduction under Section 1.8(i) has not occurred;" and

> (3) the purpose of Article 1.8(i) is only to preclude changes that make a Participant's continued employment "degrading or humiliating."

*Id.* at 866, n. 12. The district court reasoned that this language imposed requirements beyond those articulated in the Plan as the Plan does not reference the size of the business unit, there is no Plan language requiring a "significant adverse effect," or requiring such an effect on a Participant's status in the organization, reporting relationships or participation in major decisions, and the Plan says nothing about whether the changes to the Participants's job must be "degrading or humiliating."[5] *Id.* at 867. The district court identified these limitations as modifications to the original Plan and not merely interpretations of it, and concluded that the addition of the extraneous conditions was arbitrary and capricious. *Id.* We agree with the district court's conclusions.

The defendants argue that, in coming to this conclusion the district court conducted a *de novo* review. We must not, however, misconstrue the district court's careful consideration of the facts and proceedings of the Committee as *de novo* review. Unlike the district courts in the out-of-circuit cases cited by the defendants, the district court here did not re-weigh evidence (*see Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir. 2001)), did not substitute its own weighing of the conflicting evidence for that of the Committee (*see Bolling v. Eli Lilly & Co.*, 990 F.2d 1028, 1029 (8th Cir. 1993)), nor did it simply reject the Committee's reasonable decision merely because it disagreed with the conclusion (*see Fletcher Merrit v. Nor-Am Energy Corp.*,

---

[5]  The district court noted that the term, "adverse effects" imposed by the Committee is not merely the equivalent of the Plan language that requires a "significant reduction" in job authority, position, title, functions, duties or responsibilities. *Id.*

250 F.3d 1174, 1180 (8th Cir. 2001)). What the district court did do was to consider the undisputed facts regarding the diminution of Dabertin's territory and responsibilities and her added general managerial duties and assess the plain language of the Plan to determine whether there was any reasonable basis for the Committee's conclusion that Dabertin had not experienced a significant reduction in the scope of her authority, position, title, functions, duties or responsibilities. And although the district court recognized the vast amount of deference due to the Committee, it found that the Committee's decision lacked any rational connection between the plain meaning of the language of the Plan that permits benefits to those who have suffered "a significant reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities" and the Committee's decision to deny Dabertin benefits.

Furthermore, because it must have been clear to the district court that "it would be unreasonable for the plan administrator to deny the application on any ground," *Hess*, 274 F.3d at 464, the district court did not err by refusing to remand the case to the Committee for further reconsideration. *Id. See also Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (no remand necessary where "no new evidence could produce a reasonable conclusion permitting a denial of the claim.") The defendants state that it is "quite likely that the Committee could consider additional evidence that would produce a reasonable conclusion permitting denial of Ms. Dabertin's claim," (Appellants' Brief at 24), yet they fail to inform the court what that evidence might be or why the Committee did not consider it in the first place. It would be a terribly unfair and inefficient use of judicial resources to continue remanding a case to the Committee to dig up new evidence until it found just the right support for its decision to deny an employee her benefits. *See Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 n. 13 (5th Cir. 1999) (en banc) (parties must make their full records before coming to the federal courts as

"allowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided.") The district court appropriately concluded that a remand would serve no purpose. It did however, schedule further proceedings to determine the proper amount of damages.

On March 25, 2003, the district court determined the amount of Dabertin's severance bonus benefit and on March 27, 2003, it entered an order calculating the full amount of Dabertin's severance benefits and prejudgment interest, awarding Dabertin $785,150 in benefits and $245,775 in prejudgment interest. Dabertin disputes the calculation the district court made in its March 25, 2003 order calculating the bonus benefit. Under the terms of Article IV(B) of the Plan, employees who were entitled to severance benefits under the Plan were also entitled to their bonus under the following provision:

> The Company shall pay to the Participant as a bonus for the year in which his Termination Date falls an amount equal to a portion (determined as provided in the next sentence) of the maximum bonus that the Participant could have received under the Company's annual bonus program for the *fiscal year* in which his termination Date falls. Such portion shall be determined by dividing the number of days of the Participant's employment *during such calendar year* up to his Termination Date by 365 (366 if a leap year). Such payment shall be made in a lump sum within 30 days after such Termination Date, and the Participant shall have no right to any further bonuses under said program.

(Sep. App. at 164) (emphasis supplied). When it came time to calculate the bonus owed to Dabertin, the parties noticed a quirk in the language of the Plan. Although HCR operated on a fiscal year calendar and employees had been given

their bonuses at the end of the previous fiscal year, the Plan makes reference to a calendar year in determining the amount of the benefit. Dabertin argues that the Committee should have applied the plain language of the Plan and calculated her bonus based on the number of days she worked in the calendar year 1998. HCR, on the other hand, concluded that the Plan language was inherently ambiguous and should be interpreted in a manner that made logical sense—that was to use the fiscal calendar year that had been used for all previous bonus calculations and payments. The practical ramification is that under Dabertin's method, she would receive a prorated bonus based on approximately eleven months of work (January 1, 1998 through November 20, 1998). Under HCR's method, she would receive a prorated bonus based on approximately six months of work (June 1, 1998 through November 20, 1998).

The district court agreed with HCR that the Plan language "such calendar year" was ambiguous. As the district court noted, because the word "such" in this context means "aforementioned" (*See Black's Law Dictionary*, 1432 (6th Ed. 1990) ("Identical with, being the same as what has been mentioned . . . referring to the last antecedent")), that phrase must refer to a prior discussion of a calendar year. There is no prior mention of a calendar year in Article IV(B) however. The district court concluded that the inconsistency could be resolved by interpreting "calendar year" to mean "fiscal year." The district court bolstered its conclusion that this was the right result by looking at how HCR intended to compensate its employees. "It doesn't make sense," the district court reasoned, "to employ the calendar year in the severance bonus benefit calculation, in view of the clear intent of the clause to allocate and fairly compensate a severed participant for the portion of the fiscal year that the participant worked." (R. at 111). Because HCR had paid bonuses to employees for the fiscal year ending May 31,

1998, calculating the bonus based on a calendar year would mean that Dabertin and other participants who ended their employment with HCR in 1998 would receive two bonuses for the period between January 1, 1998 and May 31, 1998. On the flip side, participants who ended their employment with HCR during 1999 would not receive any bonus for the work they did between June 1, 1998 and December 31, 1998. Using this linguistic and logical approach, the district court determined that the Committee properly calculated Dabertin's bonus. *Id.*

Again, we must give great deference to the Committee's interpretation of its plan, including its interpretation of the ambiguous language in the Plan. *Firestone Tire*, 489 U.S. at 115. In that vein, we cannot merely apply federal common law principles of contract interpretation, but rather must view the contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan. *See Ross v. Ind. St. Teacher's Assoc. Ins. Trust*, 159 F.3d 1001, 1011 (7th Cir. 1998). Under this standard, we find that the Committee was not arbitrary and capricious in interpreting the Plan language to determine that Dabertin's bonus should be calculated based on the number of days she had worked in the fiscal year beginning June 1, 1998.

This conclusion, unfortunately, does not resolve the bonus issue entirely, as there remains a mathematical mystery that plagues the defendants' calculations. Even if we assume that the Committee was correct in determining that the bonus should be calculated based on the number of days that Dabertin worked in the fiscal year beginning June 1, 1998, HCR's final calculation of the bonus amount is mathematically incorrect. Under HCR's interpretation, Dabertin's bonus must be calculated as follows: The number of days worked in fiscal year 1998, divided by 365, multiplied by the maximum bonus amount. Both parties agree that Dabertin worked from June 1, 1998 through November

20, 1998, and both parties agree that the maximum amount of Dabertin's bonus for fiscal year 1998 was $122,330.[6] By this court's calculation, Dabertin worked 173 days in the fiscal year beginning June 1, 1998. Plugging these numbers into the equation, the calculation appears as follows: 173/365*122,330 = $57,981.07. The defendants, however, calculated a total bonus amount of $58,477. We have previously held that we need not remand to the Plan administrator when all that remains to be accomplished is a mechanical calculation of the amount of benefits due. *Reich v. Ladish Co, Inc.*, 306 F.3d 519, 525 (7th Cir. 2002). We therefore remand to the district court for the purpose of untangling the mathematical error and resolving this discrepancy of $495.93 in line with this court's discussion above.

Because we affirm the district court's decision that Dabertin was entitled to severance benefits pursuant to the Article 1.8(i) "Good Reason" claim under the Plan, we need not address Dabertin's other claims regarding the breach of fiduciary duty and the use of heightened scrutiny and turn instead to the district court's award of attorneys' fees and costs.

We review the district court's award of attorneys' fees and costs only for an abuse of discretion. *Hess*, 274 F.3d at 464. HCR does not dispute that Dabertin would be entitled to fees if she prevailed, they argue only that Dabertin is not entitled to fees if she is not a prevailing party. Because we affirm the district court's conclusion that Dabertin prevailed in her claim for benefits under the Plan, we also affirm the district court's award of attorneys' fees and costs pursuant to the terms of that Plan.

---

[6]  (R. at 107, p.3; 108, p.7; 109 at pp.4-5).

## III.

In sum, because the district court did not err in finding that the Committee was arbitrary and capricious in denying benefits to Dabertin, we affirm the court's judgment on all matters save for the calculation of Dabertin's benefit under Article IV(B) of the Plan. We vacate the district court's judgments of March 25 and March 27, and remand for recalculation of the bonus benefit amount in accord with this opinion. Appellee shall recover her cost of appeal.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.


A true Copy:

     Teste:


_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***